**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |
|---|---|
| NOVO NORDISK INC., | Civil Action No. 3:25-cv-02061-E |
| Plaintiff, |  |
| v. | DEMAND FOR JURY TRIAL |
| LINK PHARMACY LLC, |  |
| Defendant. |  |

## FIRST AMENDED COMPLAINT

Plaintiff Novo Nordisk Inc. ("Plaintiff" or "Novo Nordisk"), by and through its attorneys, Bowman & Brooke LLP and Covington & Burling LLP, brings this action against Defendant Link Pharmacy LLC ("Defendant" or "Link Pharmacy"), for damages and to enjoin Link Pharmacy from its unlawful, false, and misleading business practices of marketing and selling non-FDA approved injectable drugs that claim to contain semaglutide in violation of numerous state laws. Novo Nordisk alleges as follows on actual knowledge with respect to itself and its own acts and on information and belief as to all other matters.

## I.    FACTUAL ALLEGATIONS

**A.    Novo Nordisk Is the Only Company in the U.S. with FDA-Approved Medicines Containing Semaglutide**

1. Novo Nordisk is a healthcare company with a 100-year history of innovation in developing medicines to treat serious chronic diseases like diabetes and obesity.

2.      The development of semaglutide is an example of Novo Nordisk's commitment to innovation for those living with chronic diseases.  Semaglutide is the foundational molecule that serves as the primary ingredient for Novo Nordisk's three prescription-only medicines approved by the Food and Drug Administration ("FDA"):  Ozempic® (semaglutide) injection and Rybelsus® (semaglutide) tablets for adults with type 2 diabetes and Wegovy® (semaglutide) injection for chronic weight management.

3.      Wegovy® is an injectable medication indicated to reduce excess body weight and maintain weight reduction long-term in adults and children aged ≥ 12 years with obesity, and some adults that are overweight with weight-related medical problems, along with a reduced calorie diet and increased physical activity. Wegovy® is also indicated, with a reduced calorie diet and increased physical activity, to reduce the risk of major adverse cardiovascular events such as cardiovascular death, heart attack, or stroke in adults with known heart disease and with either obesity or overweight.

4.      Ozempic® is an injectable medication and Rybelsus® is an oral medicine indicated for adults with type 2 diabetes to improve blood sugar (glucose), along with diet and exercise.  Ozempic® also lowers the risk of major cardiovascular events such as stroke, heart attack or death in adults with type 2 diabetes and known heart disease and reduces the risk of sustained estimated glomerular filtration rate

(eGFR) decline, end-stage kidney disease, and cardiovascular death in adults with type 2 diabetes and chronic kidney disease.

5. Each of Wegovy®, Ozempic®, and Rybelsus® medicines has a unique safety and efficacy profile which is detailed in its respective product label.

6. Wegovy®, Ozempic®, and Rybelsus® are prescription-only medicines that should only be prescribed in direct consultation with, and under the supervision of, a licensed healthcare professional.

7. Wegovy®, Ozempic®, and Rybelsus® medicines have been extensively studied in clinical trials and are FDA-approved for the treatment of patients with serious chronic diseases.

8. Novo Nordisk is the only company in the U.S. authorized to sell FDA-approved products containing semaglutide.

9. FDA has not approved any generic versions of semaglutide.

10. To the contrary, FDA has sent warning letters to companies that have claimed that their unapproved products have the "[s]ame active ingredient as Ozempic®, Rybelsus® and Wegovy®," noting that Ozempic® and Wegovy® medicines are the only "two injectable semaglutide products FDA-approved for the

3

U.S. market."[1]

11.    Novo Nordisk does not sell its semaglutide active pharmaceutical ingredient ("API") or its semaglutide products to Link Pharmacy, or any other compounding pharmacies, for the purposes of compounding either injectable or oral semaglutide products.

12.    Defendant markets and sells to patients, products claiming to contain semaglutide that are unapproved and untailored to patient needs.  These business practices are unlawful.

13.    Various state laws require drug manufacturers to demonstrate their drugs are safe and effective in order to obtain regulatory approval to market them. Defendant violates these laws by marketing and selling unapproved new drugs throughout the United States, including into states where such sales are unlawful.

14.    Various state laws also prohibit drug manufacturers from producing compounded drugs that are untailored to patient needs, such that they copy commercially available drugs.  Defendant also violates these laws by marketing and selling untailored new drugs throughout the United States, including into states

---

[1]  FDA, *Warning Letter to Ozempen.com, MARCS-CMS 684435* (June 24, 2024), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/ozempencom-684435-06242024#:~:text=WARNING%20LETTER&text=As%20discussed%20below%2C%20FDA%20has,new%20drugs%20and%20misbranded%20drugs.

where such sales are unlawful.

## B.    The Importance of the Drug Approval Process and Compounding Requirements

15.    FDA's drug approval process serves as the foundation of U.S. drug regulation. FDA's drug review process is recognized as the gold standard worldwide. New drugs in the U.S. must undergo a rigorous evaluation of safety, quality, and effectiveness before they can be sold.

16.    Testing new drugs and obtaining the required regulatory approval to sell them is time-consuming and costly ("[o]n average, it takes 10–15 years and costs $2.6 billion to develop one new medicine"[2]), but drug approval is essential to ensure the quality, safety, and effectiveness of new drugs, and approval is based on evidence.

17.    FDA approval is famously difficult to earn. More than 90 percent of drug candidates ultimately fail.[3]

18.    Drug sponsors first subject the drug candidate to preclinical testing to determine if the product is reasonably safe for initial use in humans and if the drug

---

[2] PhRMA, *Research and Development Policy Framework* (last updated Sept. 2024), https://phrma.org/policy-issues/research-development.

[3] Biotechnology Innovation Organization, *Clinical Development Success Rates and Contributing Factors 2011-2020* at 3 (Feb. 2021), https://go.bio.org/rs/490-EHZ-999/images/ClinicalDevelopmentSuccessRates2011_2020.pdf (hereinafter "BIO 2021").

candidate exhibits pharmacological activity that justifies commercial development. Based on data derived from preclinical testing, FDA permits the drug sponsor to move the drug candidate into the clinical trial stage, in which it is tested in human subjects through increasingly complex phases of studies, typically culminating in double-blind, multi-center, placebo-controlled clinical trials.

19.    Phase I clinical trials typically evaluate the drug candidate's safety and generate data that will inform a range of doses that are safe for use in further clinical testing.   This determination typically culls a majority of drug candidates—for example, averaging across diseases, only 52 percent of drug candidates that make it through Phase I testing will progress to Phase II.[4]

20.    Phase II trials are typically designed to establish preliminarily the effectiveness in addition to further confirming safety of the drug for an indication over a range of doses and to develop additional data on its safety.  Another swath of drug candidates is eliminated in Phase II: drug candidates progress from Phase II to Phase III at rates between 15 and 48.1 percent depending on disease type.[5]  Phase III trials are designed to confirm the safety and effectiveness of a dose identified in Phase II trials in a larger patient population as well as to monitor side effects.

---

[4] BIO 2021 at 7.

[5] *Id.*

21.     Based on the data assembled during development in Phase I, Phase II, and Phase III clinical trials, a sponsor company can then submit a marketing application to FDA called a New Drug Application, where the sponsor requests that FDA approve the drug candidate for sale and marketing in the United States.  The sponsor must identify every ingredient and component in its application to FDA, as well as its manufacturing process.

22.     Once a drug is approved for manufacture and distribution, FDA conducts inspections to monitor compliance with cGMP and reviews the drug's labeling to ensure appropriate disclosure of side effects, warnings, and contraindications.  FDA also requires manufacturers to track and trace each finished product, to promptly report all adverse events, and to conduct further post-approval studies.

23.     In all, the process to test new drugs and obtain the regulatory approval to sell them requires companies to spend huge amounts of time and money.  By ignoring that process, and the legal requirements for compounding, Defendant has an unfair competitive advantage over pharmaceutical manufacturers who abide by the law, like Novo Nordisk.  Even worse, Defendant and others who ignore the approval process put patients at risk by exposing them to drugs that have not been demonstrated to be safe and effective.

24.     Defendant is engaged in unlawful and unfair business and trade

practices because Defendant manufactures and dispenses drugs in violation of the Colorado Revised Statutes, the Colorado Code of Regulations, the Connecticut Uniform Food, Drug, and Cosmetic Act, the Florida Drug & Cosmetic Act, the Georgia Drug and Cosmetic Act, the Hawaii Food, Drug, & Cosmetic Act, the Illinois Food, Drug and Cosmetic Act, the Minnesota Statutes, the North Carolina Food, Drug & Cosmetic Act, and the Texas Food, Drug, & Cosmetic Act.  These laws prohibit the sale of drugs not approved by FDA or prohibit the sale of drugs that are essentially copies of commercially available products.

C.    **Unnecessary Use of Compounded Drugs Claiming to Contain "Semaglutide" Exposes Patients to Potentially Serious Health Risks**

25.    According to FDA, "compounded drugs are not FDA-approved," and "do not undergo FDA's review for safety, effectiveness and quality before they are marketed."[6]  The Agency has also warned that "[u]necessary use of compounded drugs may expose patients to potentially serious health risks" and that "poor compounding practices can result in serious drug quality problems, such as contamination or a drug that contains too much or too little active ingredient . . .

---

[6] FDA, *FDA's Concerns with Unapproved GLP-1 Drugs Used for Weight Loss* (last updated, July 29, 2025, first posted May 31, 2023), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/fdas-concerns-unapproved-glp-1-drugs-used-weight-loss.

[which] can lead to serious patient injury and death."[7]   FDA recommends that compounded drugs "should only be used for patients whose medical needs cannot be met by an available FDA-approved drug."[8]

26.    Regulatory agencies in the United States and throughout the world have warned the public that taking unapproved compounded products that claim to contain semaglutide can endanger patients.   FDA has publicly warned that compounded glucagon-like peptide-1 (GLP-1) receptor agonists "can be risky for patients."[9]   The Agency also released a compounding risk alert to health care providers, compounders, and patients about dosing errors associated with compounded injectable semaglutide products.[10]   FDA received several adverse event reports of dosing errors involving compounded semaglutide injectable products

---

[7] FDA, *Compounding and the FDA: Questions and Answers* (last updated Nov. 15, 2024), https://www.fda.gov/drugs/human-drug-compounding/compounding-and-fda-questions-and-answers.

[8] FDA, *FDA alerts health care providers, compounders and patients of dosing errors associated with compounded injectable semaglutide products* (last updated July 26, 2024), https://www.fda.gov/drugs/human-drug-compounding/fda-alerts-health-care-providers-compounders-and-patients-dosing-errors-associated-compounded.

[9] FDA, *FDA's Concerns with Unapproved GLP-1 Drugs Used for Weight Loss* (last updated May 30, 2025), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/medications-containing-semaglutide-marketed-type-2-diabetes-or-weight-loss.

[10] FDA, *FDA alerts health care providers, compounders and patients of dosing errors associated with compounded injectable semaglutide products* (last updated July 26, 2024), https://www.fda.gov/drugs/human-drug-compounding/fda-alerts-health-care-providers-compounders-and-patients-dosing-errors-associated-compounded.

9

dispensed in multiple-dose vials.[11]  The majority of the reports described patients mistakenly drawing up more than the prescribed dose from a multiple-dose vial during self-administration; patients often administered five to 20 times more than the intended dose of semaglutide.[12]  There were even several reports that described health care providers incorrectly calculating the intended dose when converting from milligrams to units or milliliters, which resulted in patients administering five to 10 times more than the intended dose of semaglutide.[13]  For example, a patient, who is a health care provider, attempted to recalculate their own dose in units and inadvertently self-administered a dose 10 times higher than intended.[14]  Many of these patients sought medical attention or required hospitalization to treat a variety of adverse events, including nausea, vomiting, abdominal pain, fainting, headache, migraine, dehydration, acute pancreatitis, and gallstones.[15]

27.    FDA also sent a letter to the Alliance for Pharmacy Compounding, the Federation of State Medical Boards, the National Association of Boards of Pharmacy, the National Council of State Boards of Nursing and the Outsourcing

---

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

Facility Association highlighting additional factors the Agency believed contributed to the adverse events associated with compounded drugs claiming to contain semaglutide.[16]  FDA noted that prescribers have started patients on doses of compounded drugs claiming to contain semaglutide that were "approximately two to four times higher than the recommended starting doses" of FDA-approved semaglutide medicines.[17]  These compounded drugs were also prescribed to be administered twice a week instead of once weekly, doubling the recommended frequency of administration for FDA-approved semaglutide medicines.[18]  Last, prescribers titrate patients' doses "every one to two weeks instead of every four weeks," which is the recommended titration schedule for FDA-approved semaglutide medicines.[19] FDA encouraged providers and compounders to consider the possible adverse events that could arise when varying from the doses, dose frequencies, and titration schedules used in the FDA-approved products and weigh the risks versus benefits of deviating from the approved products' dosing.[20]

---

[16] Letter from Shannon Glueck, Branch Chief, Compounding Branch 4, U.S. Food and Drug Administration to Philip Dickison, Chief Executive Officer, National Council of State Boards of Nursing (July 16, 2024), https://www.pa.gov/content/dam/copapwp-pagov/en/dos/department-and-offices/bpoa/nursing/fda-safety-alert.pdf.

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.*

28.    FDA has cautioned that illegally marketed semaglutide "could contain the wrong ingredients or harmful ingredients," or "contain too little, too much or no active ingredient at all."[21]   FDA recently warned thirteen online entities that unapproved drugs purportedly containing semaglutide "may be contaminated, . . . contain varying amounts of active ingredients, or contain different ingredients altogether."[22]

29.    The Federal Bureau of Investigation (FBI) issued a public service announcement warning that compounded products claiming to contain semaglutide "pose safety risks and significant health consequences to patients, such as gastrointestinal disorders, nervous system disorders, cardiac disorders, psychiatric disorders, and death."[23]   FBI highlighted that providers are using compounded mixtures of unknown drugs that "do not contain semaglutide, drugs with high levels

---

[21] FDA, *FDA's Concerns with Unapproved GLP-1 Drugs Used for Weight Loss* (last updated May 30, 2025), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/fdas-concerns-unapproved-glp-1-drugs-used-weight-loss.

[22] *See, e.g.*, FDA, *Warning Letter to www.gorillahealing.com MARCS-CMS 664245* (Oct. 10, 2023), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/wwwgorillahealingcom-664245-10022023; FDA, *Warning Letter to www.semaspace.com MARCS-CMS 665848* (Oct. 10, 2023), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/wwwsemaspacecom-665848-10022023.

[23] *See* FBI, *Safety Concerns Related to Fraudulent Compounding Practices Associated with Weight Loss Drugs* (Feb. 28, 2025), https://www.ic3.gov/PSA/2025/PSA250228.

of impurities, and unsafe or unapproved drugs."[24]  The public service announcement also discussed that testing of compounded "semaglutide" drugs sold in multiple states revealed that these drugs did not contain semaglutide at all or had large percentages of unknown drug impurities.  One southern-based medical spa and weight loss clinic reportedly offered and sold their own compounded "semaglutide" product, which used "'animal grade' semaglutide with vitamin B12."[25]

30.    At least eighteen state boards of pharmacy, boards of medicine, and other state professional regulators have alerted licensees in their states about compounded products that claim to contain semaglutide.[26] For instance, the Alabama

---

[24] *Id.*

[25] *Id.*

[26] *See, e.g.*, Ala. Bd. Pharmacy, Compounding Semaglutide (Nov. 2023); Ala. State Bd. of Medical Examiners, Declaratory Ruling of the Alabama State Board of Medical Examiners (Aug. 8, 2024); Health Professions Bureau of the Idaho Div. of Occupational and Prof'l. Licenses, Clinic Dispensing of GLP-1 Products (May 29, 2024); Ill. Dep't. of Fin. and Prof'l. Regul., Consumer Alert: Compounded Weight Loss Drugs (Summer 2024); Kan. Bd. Pharmacy, Statement on Compounding and Dispensing of Compounded Semaglutide and Other GLP-1 Receptor Agonists (Apr. 16, 2025); Ky. Bd. Pharmacy, Semaglutide Compounding Guidance (2025); Meg Farris, Low-cost weight loss drug banned in La., 4WWL (Apr. 30, 2023) (reflecting ban by Louisiana Board of Pharmacy); Minn. Bd. Pharmacy, Semaglutide and GLP-1 Drugs (July 2024); Miss. Bd. Pharmacy, Compounded Products Due to Shortage or Due to Special Patient Needs; Miss. State Bd. of Medical Licensure, Guidance Regarding Semaglutide-Based Medications From the Mississippi State Board of Medical Licensure (Aug. 29, 2023); N.C. Bd. Pharmacy, Statement Concerning Semaglutide Compounding (Apr. 28, 2023); N.J. Bd. Pharmacy, Statement Concerning Semaglutide Compounding (Nov. 6, 2023); Ohio Bd. Pharmacy, FDA Alerts Health Care Providers, Compounders, and Patients of Dosing Errors Associated with Compounded Injectable Semaglutide Products (Aug. 2024); Or. Bd. Pharmacy, Statement on Semaglutide (Feb. 6, 2025); S.D. Bd. Pharmacy, Beware of Fraud and Counterfeit Popular Weight Loss Products

Board of Medical Examiners has cautioned that semaglutide products other than those manufactured by Novo Nordisk "may be contaminated, improperly stored and transported, or adulterated."[27]

31.    On February 19, 2025, a coalition of 38 state Attorneys General urged FDA to take decisive action against "bad actors unlawfully profiting off the high demand for FDA-approved weight loss and diabetes drugs."[28]  The letter sent by the Attorneys General encouraged FDA to "ramp up enforcement against any compounding pharmacies" due to the numerous serious adverse events associated with contaminated drug products produced by compounding pharmacies under insanitary conditions.[29]  Seven state Attorneys General also released separate alerts warning patients in their states about compounded drugs claiming to contain

---

(Jan. 2024); Utah Bd. Pharmacy, Compounded Semaglutide – Cautions and Concerns (May 2024); Wash. State Department of Health, Statement on Compounding Semaglutide (Aug. 22, 2024); W. Va. Bd. Pharmacy, Statement Concerning Semaglutide Compounding (Apr. 2023).

[27] Ala. Bd. Med. Exam'rs & Med. Licensure Comm'n, *Concerns with Semaglutide and Other GLP-1 Receptor Agonists*, https://www.albme.gov/press-release/concerns-with-semaglutide-and-other-glp-1-receptor-agonists.

[28] Letter from The National Association of Attorneys General to Acting Commissioner Sara Brenner, U.S. Food and Drug Administration (Feb. 19, 2025), https://www.naag.org/wp-content/uploads/2025/02/FDA-GLP-1-Ltrhead-e.pdf.

[29] *Id.*

semaglutide.[30]  For example, the Illinois Attorney General alerted consumers that many sellers advertising "name brand medications [such as Ozempic® and Wegovy®] are instead offering unapproved versions of these products that may put people's health at risk."[31]  The Attorney General further warned consumers about misleading advertising that claims to offer name brand GLP-1 medications when the seller is actually selling compounded drugs, which the Attorney General affirms "are not the same as generic drugs."[32]

32.    On July 25, 2025, a bipartisan group of 81 members of the U.S. House of Representatives urged FDA Commissioner Marty Makary to take immediate action against unapproved versions of anti-obesity medications, "which include

---

[30] *See, e.g.*, Office of the Illinois Attorney General Kwame Raoul, *Attorney General Raoul Reminds Illinois Residents to be Vigilant When Seeking GLP-1 Drugs for Weight Loss* (updated Jan. 3, 2025), https://www.illinoisattorneygeneral.gov/news/story/updated-consumer-alertattorney-general-raoul-reminds-illinois-residents-to-be-vigilant-when-seeking-glp-1-drugs-for-weight-loss; Office of South Carolina Attorney General Alan Wilson, *CONSUMER ALERT: Attorney General Alan Wilson warns consumers to be cautious when purchasing unapproved and compounded weight loss medications* (Jan. 3, 2025), https://www.scag.gov/about-the-office/news/consumer-alert-attorney-general-alan-wilson-warns-consumers-to-be-cautious-when-purchasing-unapproved-and-compounded-weight-loss-medications/.

[31] Office of the Illinois Attorney General Kwame Raoul, *Attorney General Raoul Reminds Illinois Residents to be Vigilant When Seeking GLP-1 Drugs for Weight Loss* (updated Jan. 3, 2025), https://www.illinoisattorneygeneral.gov/news/story/updated-consumer-alertattorney-general-raoul-reminds-illinois-residents-to-be-vigilant-when-seeking-glp-1-drugs-for-weight-loss.

[32] *Id.*

unapproved versions of the active ingredients in Ozempic and Wegovy."[33]  In a press release, Representative Richard Hudson noted that "[t]hese counterfeit products, which include unapproved versions of the active ingredients in Ozempic and Wegovy, [ ] are often smuggled from unregistered foreign suppliers, primarily in China, and pose serious risks to American consumers."[34]

33.     Patient and provider groups have also spoken out about the risks associated with compounded products claiming to contain semaglutide.[35]   On December 2, 2024, the American Diabetes Association (ADA) released a statement on compounded GLP-1 and dual glucose-dependent insulinotropic polypeptide

---

[33] Letter from Rep. Richard Hudson to FDA Commissioner Marty Makary (July 25, 2025), available at https://x.com/RepRichHudson/status/1948775451960193226.

[34] *Id*.

[35] *See, e.g.*, The Obesity Society, Obesity Action Coalition, & Obesity Medicine Association, *Leading Obesity Expert Organizations Release Statement to Patients on Compounded GLP-1 Alternatives* (Jan. 8, 2024), https://www.obesityaction.org/wp-content/uploads/GLP-1-Compounded-Alternative-Statement_Final_Logos-1.pdf; Endocrine Society, *Webinar will examine concerns around compounding anti-obesity medications* (Nov. 6, 2024), https://www.endocrine.org/news-and-advocacy/news-room/2024/webinar-will-examine-concerns-around-compounding-anti-obesity-medications; National Academies of the Sciences, Engineering, and Medicine, *New Weight Loss Drugs (GLP-1s) Explained: Science, Impact, Potential* (Nov. 21, 2024), https://www.nationalacademies.org/event/43965_11-2024_new-weight-loss-drugs-glp-1s-explained-science-impact-potential; Pediatric Endocrine Society, *Statement on use of compounded semaglutide and other GLP-1 receptor agonists* (Jan. 16, 2024), https://pedsendo.org/drug-shortages/statement-on-use-of-compounded-semaglutide-and-other-glp-1-receptor-agonists/; Letter from The Obesity Society, Obesity Action Coalition, & Others, to Sara Brenner, M.D., Acting Commissioner of FDA, Letter to FDA Urging FDA to Enforce Federal Regulations On Compounding (Mar. 20, 2025), https://www.obesityaction.org/wp-content/uploads/FDA-Sign-On-Letter-reduced-size.pdf.

(GIP) and GLP-1 receptor agonists. The ADA "recommends against using non-FDA-approved compounded GLP-1 and dual GIP/GLP-1 RA products due to safety, quality, and effectiveness concerns and uncertainty about their content."[36]

34. Even international regulators have recognized the serious risks associated with compounded drugs claiming to contain semaglutide. In early 2025, Health Canada issued a recall notice for compounded "semaglutide" and pyridoxine drugs from an Alberta-based compounding pharmacy, highlighting that the products were "produced with an unauthorized active pharmaceutical ingredient."[37] On March 5, 2025, the South African Health Products Regulatory Authority (SAHPRA) announced its intention to declare compounded drugs containing GLP-1 agonists undesirable, and therefore unable to be sold, under South Africa's Medicines and Related Substances Act.[38] According to the Act, SAHPRA may declare a medicine

---

[36] Joshua J. Neumiller et al., *Compounded GLP-1 and Dual GIP/GLP-1 Receptor Agonists: A Statement from the American Diabetes Association*, 48 DIABETES CARE 177—181, 178 (Feb. 2025), https://diabetesjournals.org/care/article/48/2/177/157478/Compounded-GLP-1-and-Dual-GIP-GLP-1-Receptor.

[37] Health Canada, *Health Product Recall: Semaglutide + Pyridoxine: produced with an unauthorized active pharmaceutical ingredient* (Jan. 21, 2025), https://recalls-rappels.canada.ca/en/alert-recall/semaglutide-pyridoxine-produced-unauthorized-active-pharmaceutical-ingredient.

[38] South African Health Products Regulatory Authority, *Communication to Stakeholders: INTENTION TO DECLARE MEDICINES COMPOUNDED IN TERMS OF SECTION 14(4) CONTAINING GLP-1 OR GLP-1/GIP AGONISTS UNDESIRABLE IN TERMS OF SECTION 23 OF THE MEDICINES AND RELATED SUBSTANCES ACT, ACT 101 OF 1965, AS AMENDED* (Mar. 5, 2025), https://www.sahpra.org.za/wp-content/uploads/2025/03/Comms-to-Industry-RC03-Intention-to-Declare-Medicines-Compounded.pdf.

as undesirable if it is not in the public interest that such a medicine is made available to the public. SAHPRA concluded that compounded products using GLP-1 agonist active ingredients are not in the public interest because of the inherent variability, lack of regulatory oversight, and potential safety risks associated with such practices.[39] The Australian government took the largest step to protect patients and banned compounding pharmacies in Australia from making GLP-1s like semaglutide based on safety concerns.[40]

**D.    Erroneously Manufactured Compounded Drugs Have Historically Endangered Patient Health and Safety**

35.    The danger is not merely theoretical, as manufacturing and distribution of improperly formulated compounded drugs have endangered or adversely impacted public health. There is a long history of U.S. illnesses and deaths associated with erroneously compounded drugs distributed to patients in various states, including Texas.[41]

---

[39] *Id.*

[40]    *Therapeutic Goods Act 1990* (effective date Oct. 1, 2024), https://www.legislation.gov.au/F1996B00406/latest/text; Ministers Department of Health and Aged Care, *Protecting Australians from Unsafe Compounding of Replica Weight Loss Products* (May 22, 2024), https://www.health.gov.au/ministers/the-hon-mark-butler-mp/media/protecting-australians-from-unsafe-compounding-of-replica-weight-loss-products?language=en.

[41] Pew Charitable Trusts, *U.S. Illnesses and Deaths Associated with Compounded or Repackaged Medications 2001-19* (Mar. 2, 2020), https://www.pewtrusts.org/en/research-and-analysis/data-visualizations/2020/us-illnesses-and-deaths-associated-with-compounded-or-repackaged-medications-2001-19.

36.    One of the most significant outbreaks was the New England Compounding Center crisis.  In 2012, nearly 800 patients in 20 states were diagnosed with a fungal infection after receiving injections of an unapproved preservative-free methylprednisolone acetate drug manufactured in Massachusetts.[42]    The U.S. Centers for Disease Control and Prevention reported that 64 patients in nine states died, though other sources report the death toll as exceeding 100 victims.[43]  Florida alone reported 25 cases of persons with fungal infections linked to steroid injections and 7 deaths.[44]  As FDA has stated, the 2012 fungal meningitis outbreak "was the most serious in a long history of serious adverse events associated with contaminated, super-potent, mislabeled, or otherwise poor quality compounded drugs," and "many serious adverse events linked to poor quality compounded drugs, including outbreaks of infections and deaths have occurred since then."[45]

37.    Additionally, there have been notable public health incidents involving

---

[42] DOJ, *New England Compounding Center Pharmacist Sentenced for Role in Nationwide Fungal Meningitis Outbreak* (Jan. 31, 2019), https://www.justice.gov/usao-ma/pr/new-england-compounding-center-pharmacist-sentenced-role-nationwide-fungal-.

[43] *Id.*

[44] CDC, *Multistate Outbreak of Fungal Meningitis and Other Infections – Case Count* (updated Oct. 30, 2015), https://archive.cdc.gov/www_cdc_gov/hai/outbreaks/meningitis-map-large.html.

[45] FDA, *FDA's Human Drug Compounding Progress Report: Three Years After Enactment of the Drug Quality and Security Act | January 2017* (last updated June 21, 2018), https://www.fda.gov/drugs/human-drug-compounding/fdas-human-drug-compounding-progress-report-three-years-after-enactment-drug-quality-and-security.

compounded drugs affecting Texas patients and/or originating from Texas compounding pharmacies. One significant example occurred in 2017, where a compounding pharmacy in Dallas, Texas, compounded eye injections found to contain poloxamer 407, which is not used in any FDA-approved product intended for intravitreal injection.[46] Another Texas compounding pharmacy was found to have shipped a contaminated injectable magnesium sulfate solution nationally, resulting in a multistate outbreak of *Serratia marcescens* bloodstream infections.[47] In 2007, another Texas compounding pharmacy shipped misbranded colchicine injectable solutions, ranging from 640 percent to just 62 percent of the labeled strength, leading to the death of three patients.[48]

38. FDA has issued "compounding risk alerts to inform health care professionals and compounders about risks associated with compounded drugs, including information on adverse events, outbreaks and issues with product

---

[46] FDA, *FDA's investigation into Guardian's compounded triamcinolone-moxifloxacin drug product* (last updated July 5, 2018), https://www.fda.gov/drugs/human-drug-compounding/fdas-investigation-guardians-compounded-triamcinolone-moxifloxacin-drug-product.

[47] Rebecca Sunenshine et al., *A Multistate Outbreak of Serratia marcescens Bloodstream Infection Associated With Contaminated Intravenous Magnesium Sulfate From a Compounding Pharmacy*, 45 Clinical Infectious Diseases 527-533 (Sept. 1, 2007), https://pubmed.ncbi.nlm.nih.gov/17682984/.

[48] DOJ, *Dallas Compounding Pharmacy Owner Pleads Guilty in Connection with Misbranded Drug Shipment* (Apr. 24, 2012), https://www.justice.gov/opa/pr/dallas-compounding-pharmacy-owner-pleads-guilty-connection-misbranded-drug-shipment.

quality."[49]  These alerts have warned about compounded drugs that did not contain the active ingredient listed on the label of the product[50] and the variability in dosages of the active ingredients in compounded drug products intended for oral and sublingual administration.[51]  FDA believes that these issues make it "challenging to predict which potential risks may be associated with these products," and place patients "at risk for serious adverse events, misuse, and abuse."[52]  These alerts have warned about compounded drugs with strengths below what is labeled, the presence of impurities, and hypersensitivity reactions, which are immunologic responses.[53] They also have described the risks associated with compounding drug products when there are "[c]omplexities related to the quality and sourcing of the" API and

---

[49]   FDA, *Compounding Risk Alerts* (last updated Apr. 22, 2025), https://www.fda.gov/drugs/human-drug-compounding/compounding-risk-alerts.

[50] FDA, *FDA investigates two adverse events associated with United Pharmacy's compounded glutamine, arginine, and carnitine product for injection* (last updated June 21, 2018), https://www.fda.gov/drugs/human-drug-compounding/fda-investigates-two-adverse-events-associated-united-pharmacys-compounded-glutamine-arginine-and.

[51] FDA, *FDA warns patients and health care providers about potential risks associated with compounded ketamine products, including oral formulations, for the treatment of psychiatric disorders* (last updated Oct. 10, 2023), https://www.fda.gov/drugs/human-drug-compounding/fda-warns-patients-and-health-care-providers-about-potential-risks-associated-compounded-ketamine.

[52] *Id.*

[53]   FDA, *FDA Investigates Two Serious Adverse Events Associated with ImprimisRx's Compounded Curcumin Emulsion Product for Injection* (last updated June 21, 2018), https://www.fda.gov/drugs/human-drug-compounding/fda-investigates-two-serious-adverse-events-associated-imprimisrxs-compounded-curcumin-emulsion.

formulation.[54]

### E.    Patients Have Reported Adverse Events After Taking Unapproved Compounded Drugs Claiming to Contain "Semaglutide"

39.    FDA has reported that it has "received reports of adverse events related to compounded versions of semaglutide," and has reminded patients and health care professionals that these "unapproved versions do not undergo FDA's review for safety, effectiveness, and quality before they are marketed."[55]

40.    According to FDA's Adverse Event Reporting System, as of March 31, 2025, there had been 767 cases of adverse events associated with compounded products that purport to contain semaglutide.[56] This figure is triple the number of adverse events for *all* compounded drugs in fiscal year 2022.[57] FDA has classified approximately 75 percent of those cases as "serious" adverse events; approximately

---

[54] FDA, *FDA Alerts Health Care Professionals and Compounders of Potential Risks Associated with the Compounding of Remdesivir Drug Products* (last updated Feb. 4, 2021), https://www.fda.gov/drugs/human-drug-compounding/fda-alerts-health-care-professionals-and-compounders-potential-risks-associated-compounding.

[55] FDA, *FDA's Concerns with Unapproved GLP-1 Drugs Used for Weight Loss* (last updated Mar. 17, 2025), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/fdas-concerns-unapproved-glp-1-drugs-used-weight-loss.

[56] FDA, *FAERS Public Dashboard*, https://fis.fda.gov/sense/app/95239e26-e0be-42d9-a960-9a5f7f1c25ee/sheet/45beeb74-30ab-46be-8267-5756582633b4/state/analysis (search for all drug products including "semaglutide" and filter by "Compounded Drug" tag).

[57] FDA, *Mitigating Risks of Compounded Drugs Through Surveillance* (current as of Sept. 20, 2023), https://www.fda.gov/drugs/human-drug-compounding/mitigating-risks-compounded-drugs-through-surveillance.

25 percent of those cases have resulted in hospitalization; and 14 of those cases involved patient deaths.[58]   Several cases reported in the database claim that the compounded product was ineffective or had product quality issues.  FDA itself notes that the number of adverse events is likely underreported.[59]  These adverse events are underreported because unlike manufacturers of FDA-approved medicines, federal law does not require state-licensed pharmacies to submit adverse events to FDA[60] and outsourcing facilities only report adverse events they believe to be serious and unexpected.[61]

**F.    Defendant's Activities Violate State Unfair Competition Laws By Selling Unapproved and Untailored Drugs**

**a. Colorado, Connecticut, Florida, Georgia, Hawaii, Illinois, North Carolina, and Texas Law Prohibit Selling Unapproved Drugs**

41.    Defendant's manufacturing, marketing, sale, and distribution of unapproved new drugs, under the guise of compounding, is unlawful.

---

58  FDA, *FAERS Public Dashboard*,  https://fis.fda.gov/sense/app/95239e26-e0be-42d9-a960-9a5f7f1c25ee/sheet/45beeb74-30ab-46be-8267-5756582633b4/state/analysis (search for all drug products including "semaglutide" and filter by "Compounded Drug" tag).

59 FDA, *FDA's Concerns with Unapproved GLP-1 Drugs Used for Weight Loss* (last updated Mar. 17, 2025), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/fdas-concerns-unapproved-glp-1-drugs-used-weight-loss.

60 *Id.*

61 *See* FDA, *Guidance for Industry: Adverse Event Reporting for Outsourcing Facilities Under Section 503B of the Federal Food, Drug, and Cosmetic Act* (Oct. 2015), https://www.fda.gov/media/90997/download.

42.    Under the laws of Colorado, Connecticut, Florida, Georgia, Hawaii, Illinois, North Carolina, and Texas, a new drug may not be introduced or delivered for introduction into commerce unless an application approved by FDA under section 505 of the FDCA is in effect for the drug.  *See* 21 U.S.C. § 355(a); Colo. Rev. Stat. § 12-280-131(1); Conn. Gen. Stat. § 21a-110; Fla. Stat. § 499.023; Ga. Code Ann. § 26-3-10; Haw. Rev. Stat. § 328-17(a); 410 ILCS 620/17(a); N.C. Gen. Stat. § 106-135(a); Tex. Health & Safety Code § 431.114(a).

43.    Colorado law prohibits the sale of "any new drug not authorized to move in interstate commerce under appropriate federal law."[62]  Colo. Rev. Stat. § 12-280-131(1).

44.    The Connecticut Uniform Food, Drug and Cosmetic Act states that "no person shall sell, deliver, offer for sale, hold for sale or give away any new drug unless an application with respect thereto has been approved under Section 355 of the federal act [which outlines the premarket approval requirement]."  Conn. Gen. Stat. § 21a-110(a).

45.    The Florida Drug and Cosmetic Act provides that no person may "sell, offer for sale, hold for sale, manufacture, repackage, distribute, or give away any

---

[62] Federal law prohibits delivering any drug for introduction into interstate commerce unless an approval of an application is effective with respect to such drug.  21 U.S.C. § 355(a).

new drug" that has not been approved by FDA.  Fla. Stat. § 499.023.

46.    The Florida Drug and Cosmetic Act and Federal Food, Drug, and Cosmetic Act ("FDCA") define "drug" and "new drug" the same.  Fla. Stat. Ann. § 499.003(17) (drug), § 499.003(2) (new drug); 21 U.S.C. § 321(g)(1), (p).

47.    The Georgia Drug and Cosmetic Act provides that no person "shall sell, deliver, offer for sale, hold for sale, or give away any new drug unless" it has been approved by FDA or an application has been filed with the State Board of Pharmacy.  Ga. Code Ann. § 26-3-10.

48.    Hawaii's Food, Drug, and Cosmetic Act provides that no person "shall sell, deliver, offer for sale, hold for sale, or give away any new drug" that has not been approved by FDA or any application has been submitted to the Hawaii director of health.  Haw. Rev. Stat. § 328-17(a).

49.    Illinois's Food, Drug and Cosmetic Act states that no person "shall sell, deliver, offer for sale, hold for sale or give away any new drug" unless "an application with respect thereto has been approved and the approval has not been withdrawn under Section 505 of the Federal Act."  410 ILCS 620/17(a).

50.    North Carolina's Food, Drug and Cosmetic Act provides that no person "shall sell, deliver, offer for sale, hold for sale or give away any new drug" unless it has been approved by FDA or an application has been submitted to the North Carolina Commissioner of Agriculture.  N.C.G.S.A. § 106-135(a).

51.    The Texas Food, Drug, and Cosmetic Act states that "A person shall not sell, deliver, offer for sale, hold for sale or give away any new drug unless: [] an application with respect thereto has been approved and the approval has not been withdrawn under Section 505 of the [Federal Food, Drug, and Cosmetic Act]" and "a copy of the letter of approval or approvability issued by the United States Food and Drug Administration is on file with the department if the product is manufactured in this state."  Tex. Health & Safety Code § 431.114(a).

52.    Defendant does not have an approved New Drug Application or Abbreviated New Drug Application for any semaglutide drug product.

53.    Defendant is violating Colorado, Connecticut, Florida, Georgia, Hawaii, Illinois, North Carolina, and Texas law because it is manufacturing, marketing, selling and distributing into several states, including Colorado, Connecticut, Florida, Georgia, Hawaii, Illinois, North Carolina, and Texas, its semaglutide drugs which have not been approved by FDA (or any other relevant regulatory authority).

### b. Colorado and Minnesota Law Prohibit Compounding Pharmacies from Selling Untailored Drugs

54.    Defendant's manufacturing, marketing, sale, and distribution of untailored new drugs, under the guise of compounding, is unlawful.

55.    Defendant falsely promotes that it offers "[p]ersonalized follow up,"

"personalized weight loss assessment[s]," and "one-on-one consultation[s]."[63]

56.    However, upon information and belief, Defendant's "semaglutide" drugs are not personalized.  Patients are prescribed semaglutide via a standardized prescription form, in which pre-determined configurations of vial sizes and dosages are selected through checkboxes.  Further, upon information and belief, all of Defendant's "semaglutide" drugs are mixed with L-carnitine, regardless of the patient's specific need.

57.    Under the laws of Colorado and Minnesota, compounded drugs cannot be essentially copies of commercially available drugs, and must have a significant and necessary difference between the compounded drug and the commercially available drug as determined by a prescriber.  3 Colo. Code Regs. § 719-1:21.00.30(f); Minn. Stat. §§ 151.253, Subd. 2(4)–(5).

58.    Under Colorado law, "Compounding does not include the preparation of copies of commercially available drug products."  3 Colo. Code Regs. § 719-1:21.00.30(f)(2).  "Compounded preparations that produce, for the patient, a significant difference between the compounded drug and the comparable commercially available drug product as determined, by the prescriber, as necessary

---

[63] *See* Link Pharmacy, Weight Loss (last visited June 10, 2025), https://www.linkrx.org/weight-loss/.

for the medical best interest of the patient are not copies of commercially available products." *Id*. "Significant differences" may include, for instance, changes in strength or dosage form, delivery mechanism, or removal of dye. *Id.* Price differences are not considered "significant differences." *Id.*

59.    Under Minnesota law, a drug product may be compounded if a pharmacist "does not compound any drug products that are essentially copies of a commercially available drug product." Minn. Stat. § 151.253, Subd. 2(4). Compounded drugs are those in which "there is a change, made for an identified individual patient, that produces for that patient a significant difference, as determined by the prescribing practitioner, between the compounded drug and the comparable commercially available drug product." Minn. Stat. § 151.253, Subd. 2(5).

60.    Upon information and belief, Defendant's drugs are essentially copies of Novo Nordisk's semaglutide drugs. Defendant's drugs are not individually tailored to patients' needs, and lack significant differences between Defendant's products and Novo Nordisk's products.

61.    Defendant is violating Colorado and Minnesota law because (i) it is selling untailored semaglutide drugs across several states, including, on information and belief, in Colorado and Minnesota, and (ii) these untailored drugs are essentially copies of and lack significant differences from Novo Nordisk's commercially

available semaglutide products.

## G.    Plaintiff Has Been Injured by Defendant's Unlawful, Deceptive, and Unfair Competition

62.    Novo Nordisk is the only company in the United States with FDA-approved products containing semaglutide.

63.    Defendant sells its unapproved and untailored drugs, manufactured in Texas, claiming to contain semaglutide to customers in Colorado, Connecticut, Florida, Georgia, Hawaii, Illinois, Minnesota, North Carolina, Texas and other states.

64.    As a result of Defendant's unlawful, deceptive, and unfair competition, which jeopardizes public health, Defendant has interfered with Novo Nordisk's ability to conduct its business.  Specifically, Defendant's marketing and sale of unapproved and untailored drugs to customers harms Novo Nordisk because Novo Nordisk, as the only company in the United States with FDA-approved products containing semaglutide, undergoes rigorous testing to ensure its products are the correct potency and do not contain harmful levels of impurities, while Defendant can undercut Novo Nordisk on price by foregoing steps to ensure its products are safe and effective for consumers.  Novo Nordisk also conducts pharmacovigilance, including adverse event reporting and tracking, which upon information and belief, Defendant does not.

65.    As noted above, Novo Nordisk is the only manufacturer of FDA-

approved medicines containing semaglutide. Semaglutide is synonymous with Novo Nordisk, and many consumers believe they are obtaining a Novo Nordisk product when the product they are obtaining is actually compounded "semaglutide."

66. As a result of Defendant's unlawful, deceptive, and unfair competition, which jeopardizes public health, Novo Nordisk has and will continue to suffer harm to its goodwill and reputation given the common association by consumers of compounded semaglutide products like Defendant's and Novo Nordisk's safe and effective FDA-approved semaglutide medicines. Because semaglutide is synonymous with Novo Nordisk, patients who have negative experiences from Defendant's compounded "semaglutide" may erroneously view Novo Nordisk as the cause of those negative experiences.

67. In addition, absent Defendant's unlawful and unfair actions, sales made by Defendant would and will have been made by Novo Nordisk; thus, Novo Nordisk has and will suffer lost sales and customers as a direct result of Defendant's unlawful and unfair competition. Novo Nordisk seeks damages from Defendant's past violations of state unfair competition laws.

**H.   Plaintiff Seeks Damages and to Enjoin Defendant From Its Unlawful Practices**

68. Novo Nordisk brings this action under the Colorado Consumer Protection Act ("CCPA"), the Connecticut Unfair Trade Practices Act ("CUTPA"), the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), the Georgia

Unfair Deceptive Trade Practices Act ("GUDTPA"), the Hawaii Unfair and Deceptive Acts and Practices Act ("HUDAP"), Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), the Minnesota Deceptive Trade Practices Act ("MDTPA"), the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA"), and Texas unfair competition law to stop Defendant from unlawfully marketing, selling, and distributing its unapproved drugs.  Novo Nordisk seeks a declaration that Defendant's business practice violates CCPA, CUTPA, FDUTPA, GUDTPA, HUDAP, ICFA, MDTPA, NCUDTPA, and Texas unfair competition law and entry of a preliminary and permanent injunction prohibiting Defendant from committing such violations.  Novo Nordisk also seeks damages for financial injuries incurred as a proximate result of Defendant's violations of these unfair competition laws, as well as attorney's fees and court costs.

## II.    THE PARTIES

69.    Novo Nordisk is a corporation organized and existing under the laws of Delaware, with a principal place of business in New Jersey.

70.    Novo Nordisk promotes, offers, and/or sells FDA-approved, semaglutide-based products—Wegovy®, Ozempic®, and Rybelsus®—throughout the United States.  Novo Nordisk is the only company in the U.S. with FDA-approved products containing semaglutide.  FDA has not approved any generic versions of semaglutide.  Novo Nordisk does not sell its semaglutide active

pharmaceutical ingredient ("API") to Link Pharmacy, or any other compounding pharmacies, for the purposes of compounding semaglutide products.

71.     Novo Nordisk and/or its parents and affiliates have invested significant time and resources to research, develop, manufacture, and test Wegovy®, Ozempic®, and Rybelsus® in order to obtain regulatory approval from FDA to market these drugs.

72.     Link Pharmacy LLC is a limited liability company organized and existing under the laws of Texas, with its principal place of business at 18484 Preston Rd., Suite 300, Dallas, Texas 75252.   Upon information and belief, Defendant manufactures its unapproved and untailored drugs at this address.

73.     Defendant's sole member, David E. Lindsey, is a citizen of Texas with a listed address of 1201 N. Riverfront Blvd., Suite 100, Dallas, Texas 75207.

74.     Defendant sells its unapproved and untailored drugs in this judicial district and across the United States, including Colorado, Connecticut, Florida, Georgia, Hawaii, Illinois, Minnesota, North Carolina, and Texas.

### III.     JURISDICTION AND VENUE

75.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332.   The parties are citizens of different States, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

76.     This Court has personal jurisdiction over Defendant.   Upon information

and belief, Defendant is a citizen of Texas, maintains its principal place of business in Texas, and manufactures and sells the unapproved drug products at issue in this action in Texas.

77. Venue in this District is proper under 28 U.S.C. § 1391(b).

## FIRST CAUSE OF ACTION

**(Violation of Colorado Consumer Protection Act ("CCPA"), Colo. Rev. Stat. § 6-1-105 *et seq.*, and Colorado Common Law of Unfair Competition) (Sale of Unapproved Drug)**

78. Plaintiff realleges and incorporates by reference each and every allegation set forth in paragraphs 1–77, above, as if fully stated herein.

79. CCPA prohibits engaging in deceptive trade practices, including "any unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent act or practice," Colo. Rev. Stat. § 6-1-105(1)(rrr), *id.* § 6-1-105(1)(z), failing to obtain "all governmental licenses or permits required to . . . sell the goods," and failing to disclose "material information concerning goods." *Id.* § 6-1-105(1)(u).

80. Defendant has engaged in unfair trade practices in Colorado by knowingly or recklessly selling unapproved "semaglutide" drugs in Colorado, in violation Colo. Rev. Stat. § 12-280-131 and Colo. Rev. Stat. § 6-1-105(1)(rrr). Defendant has failed to obtain governmental licenses or permits required to sell its drugs, in violation of Colorado Rev. Stat. § 6-1-105(1)(z). Defendant has also failed to disclose that its "semaglutide" drugs are unapproved, which is material

information omitted with the intent to induce its customers to purchase its unapproved "semaglutide" drugs, in violation of Colo. Rev. Stat. § 6-1-105(u).

81.    Defendant's unfair trade practices occurred during the course of Defendant's business.

82.    Defendant's unfair trade practices significantly impact the public, who are the consumers of its unapproved "semaglutide" drugs.  As discussed *supra*, unapproved compounded drugs pose serious risks to consumers.

83.    Plaintiff has suffered injury to a legally protected interest in its lost sales, loss of goodwill, and damage to its reputation as a result of Defendant's unlawful conduct.

84.    Plaintiff's injury is caused by Defendant's illegal sale of unapproved "semaglutide" drugs.

85.    Plaintiff is entitled to declaratory relief and damages pursuant to Colo. Rev. Stat. § 6-1-113(2)(a), as well as its reasonable attorney's fees and costs pursuant to Colo. Rev. Stat. § 6-1-113(2)(b).   Plaintiff is also entitled to disgorgement of Defendant's profits, revenues, and economic benefits wrongfully acquired.

## SECOND CAUSE OF ACTION

**(Violation of Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b) (Sale of Unapproved Drug)**

86.    Plaintiff realleges and incorporates by reference each and every

34

allegation set forth in paragraphs 1–77, above, as if fully stated herein.

87.    CUTPA prohibits "unfair methods of competition and unfair [] acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. § 42-110b(a). An act is "unfair" under Connecticut law when it offends public policy as it has been established by statutes, common law, or otherwise; if it is immoral, unethical, oppressive, or unscrupulous; or whether it causes substantial injury to consumers or competitors.

88.    Defendant's practices of selling unapproved "semaglutide" drugs in violation of Conn. Gen. Stat. § 21a-110 are offensive to public policy, and are immoral, unethical, oppressive, and unscrupulous.

89.    Defendant's unlawful conduct further offends public policy as it involves a conscious departure from known business standards in order to maximize Defendant's profits.

90.    Plaintiff is a competitor of Defendant in that Plaintiff sells FDA-approved semaglutide drugs in Connecticut, and Defendant sells non-FDA approved drugs claiming to contain "semaglutide" in Connecticut.

91.    Defendant's conduct was in the course of its primary trade or commerce.

92.    Defendant's unlawful practices have caused substantial injuries to Plaintiff and to consumers that are not outweighed by any countervailing benefits to

35

consumers or competitors that the practice produces, and the injuries are ones that Plaintiff and consumers could not reasonably have avoided.  The injuries caused by Defendant have been substantial.

93.    Within three years of the commencement of this action, Plaintiff has suffered an ascertainable loss as a result of Defendant's unlawful conduct in its lost sales, loss of goodwill, and damage to its reputation, including price erosion, lost market share, and lost customers.   Defendant's sales of its unapproved "semaglutide" drugs are the proximate cause of Plaintiff's losses

94.    Plaintiff is entitled to declaratory and injunctive relief, and actual damages under CUTPA, including its attorney's fees.  Conn. Gen. Stat. § 42-110g. Plaintiff is also entitled to disgorgement of Defendant's profits, revenues, and economic benefits wrongfully acquired.

## THIRD CAUSE OF ACTION

**(Violation of Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201, Fla. Stat., *et seq.*) (Sale of Unapproved Drug)**

95.    Plaintiff realleges and incorporates by reference each and every allegation set forth in paragraphs 1–77, above, as if fully stated herein.

96.    FDUTPA "protect[]s the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."  § 501.202(2), Fla. Stat.

36

97.    FDUTPA makes "unlawful" "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  § 501.204(1), Fla. Stat.

98.    Given that Defendant's unapproved "semaglutide" drugs pose potential harm to consumers, Defendant's sale of its drugs is a practice that is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers and to Plaintiff.

99.    The practices described herein also offend established public policy regarding the protection of consumers against companies, like Defendant, that engage in unfair methods of competition.  Defendant's conduct has caused substantial injury to Novo Nordisk in the form of harm to Novo Nordisk's goodwill and reputation that is not outweighed by countervailing benefits to any consumers or competition.

100.    The practices described herein have caused harm and injury to consumers and, if not enjoined, will continue to cause harm and injury to consumers and to Plaintiff.

101.    Defendant's business acts and practices are also unfair because they have caused harm and injury-in-fact to Novo Nordisk for which Defendant has no justification other than to increase, beyond what Defendant would have otherwise realized, its revenue from the sale of unapproved "semaglutide" drugs.

102.    Defendant has further violated FDUTPA by violating a "statute . . . which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices."   § 501.203(3)(c), Fla. Stat.   Here, Defendant violated Florida's Drug and Cosmetic Act which proscribes certain unconscionable acts and practices.   Specifically, Defendant engages in unfair, unconscionable, and deceptive conduct in "trade" and "commerce" in violation of FDUTPA when it unlawfully sells unapproved "semaglutide" drugs in Florida, in violation of § 499.023, Fla. Stat.

103.    Plaintiff is "aggrieved" under FDUTPA.

104.    Defendant is a "person" who has violated and is violating FDUTPA.

105.    As a result of Defendant's unlawful and unfair competition, Novo Nordisk has suffered harm to its goodwill and reputation, and in the form of lost sales.

106.    Plaintiff is entitled to declaratory and injunctive relief, as well as damages, and reasonable attorney's fees and costs pursuant to §§ 501.2105, 501.211, Fla. Stat.   Plaintiff is also entitled to disgorgement of Defendant's profits, revenues, and economic benefits wrongfully acquired.

## FOURTH CAUSE OF ACTION

**(Violation of Georgia Uniform Deceptive Trade Practices Act ("GUDTPA"), § 10-1-370 *et seq.*) (Sale of Unapproved Drug)**

107.    Plaintiff realleges and incorporates by reference each and every

allegation set forth in paragraphs 1–77, above, as if fully stated herein.

108. The GUDTPA prohibits deceptive trade practices including "caus[ing] likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services," Ga. Code Ann. § 10-1-372(a)(2), or "caus[ing] likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another," Ga. Code Ann. § 10-1-372(a)(3), or "[e]ngages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Ga. Code Ann. § 10-1-372(a)(12).

109. Defendant has created a likelihood of confusion or of misunderstanding by selling its unapproved "semaglutide" in violation of Ga. Code Ann. § 26-3-10(a) because it has not obtained the requisite approvals to sell new drugs under Georgia law, which is misleading patients as to the purported connection to the certification of compliance by the state of Georgia that such drugs are lawful.

110. Defendant's unfair trade practices occurred during the course of Defendant's business.

111. Novo Nordisk is a person likely to be damaged by Defendant's deceptive trade practices.

112. Novo Nordisk has suffered injury to a legally protected interest in its lost sales, loss of goodwill, and damage to its reputation as a result of Defendant's unlawful conduct.

113. Defendant will continue to injure Plaintiff so long as it continues to sell its unapproved "semaglutide" drugs.

114. Novo Nordisk is entitled to declaratory relief and an injunction pursuant to Ga. Code § 10-1-373(a), as well as reasonable attorney's fees pursuant to Ga. Code § 10-1-373(b)(2).

## FIFTH CAUSE OF ACTION

**(Violation of Hawaii Unfair and Deceptive Acts and Practices Act ("HUDAP"), Haw. Rev. Stat. § 480-1 *et seq.*) (Sale of Unapproved Drug)**

115. Plaintiff realleges and incorporates by reference each and every allegation set forth in paragraphs 1–77, above, as if fully stated herein.

116. Hawaii's unfair competition law prohibits unfair methods of competition "in the conduct of any trade or commerce." Haw. Rev. Stat. § 480-2(a).

117. Defendant has engaged in unfair competition by selling its unapproved "semaglutide" in violation of Haw. Rev. Stat. § 328-17(a) because it has not obtained the requisite approvals to sell new drugs under Hawaii law.

118. Defendant's unapproved "semaglutide" is a new drug within the meaning of Haw. Rev. Stat. § 328-4 because it is not generally recognized among experts as safe and effective for use under the conditions prescribed, recommended, or suggested in their labeling.

119. Defendant's violations of Hawaii law have interfered with Plaintiff's ability to conduct its business because Defendant can unfairly compete with Plaintiff

40

with its "semaglutide" drugs that are substantially injurious to consumers.

120. Any utility of Defendant's practices is outweighed by the harm to consumers. Defendant's practices have caused and are causing substantial injuries to Plaintiff and to the public. These injuries are not outweighed by any benefits.

121. Defendant uses an unfair and illegal business advantage by relying on Novo Nordisk's reputation with semaglutide while disregarding Hawaii law to sell its unapproved "semaglutide" drugs.

122. Novo Nordisk's business has been injured as a result of Defendant's unlawful and unfair conduct. Novo Nordisk has suffered injury to a legally protected interest in its lost sales, loss of goodwill, and damage to its reputation as a result of Defendant's unlawful conduct.

123. Under Hawaii law, "[a]ny person may bring an action based on unfair methods of competition declared unlawful by this section." Haw. Rev. Stat. § 480-2(e).

124. Novo Nordisk is a "person" under Haw. Rev. Stat. § 480-1.

125. Novo Nordisk is entitled to damages, injunctive relief, as well as reasonable attorneys' fees and costs pursuant to Haw. Rev. Stat. § 480-13. Plaintiff is also entitled to disgorgement of Defendant's profits, revenues, and economic benefits wrongfully acquired.

## SIXTH CAUSE OF ACTION

**(Violation of Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, *et seq.*) (Sale of Unapproved Drug)**

126. Plaintiff realleges and incorporates by reference each and every allegation set forth in paragraphs 1–77, above, as if fully stated herein.

127. The ICFA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices."  815 ILCS 505/2.

128. Defendant has engaged in unfair or deceptive acts or practices unlawful under the ICFA by selling and offering for sale in Illinois its unapproved "semaglutide" in violation of the Illinois Food, Drug and Cosmetic Act.   410 ILCS 620/17(a).

129. Defendant's business acts and practices are also unfair because they have caused harm and injury-in-fact to Novo Nordisk for which Defendant has no justification other than to increase, beyond what Defendant would have otherwise realized, its revenue from the sale of unapproved "semaglutide" drugs.

130. The practices described herein also offend established public policy regarding the protection of consumers against companies, like Defendant, that engage in unfair methods of competition.   Defendant's conduct has caused substantial injury to Novo Nordisk in the form of harm to Novo Nordisk's goodwill and reputation that is not outweighed by countervailing benefits to any consumers or competition.

131. Given that Defendant's unapproved "semaglutide" drugs pose potential harm to consumers, Defendant's sale of its drugs is a practice that is immoral, unethical, oppressive or unscrupulous and is substantially injurious to consumers and to Plaintiff.

132. Defendant uses an unfair and illegal business advantage by relying on Novo Nordisk's reputation with semaglutide while disregarding Illinois law to sell its unapproved "semaglutide" drugs.

133. 815 ILCS 505/10a creates a cause of action for "any person" injured by unfair methods of competition or unfair or deceptive acts or practices.

134. Novo Nordisk is a "person" under 815 ILCS 505/1.

135. Novo Nordisk has suffered injury to a legally protected interest in its lost sales, loss of goodwill, and damage to its reputation as a result of Defendant's unlawful conduct.

136. Novo Nordisk is entitled to injunctive relief, damages, and reasonable attorneys' fees and costs pursuant to 815 ILCS 505/10a. Plaintiff is also entitled to disgorgement of Defendant's profits, revenues, and economic benefits wrongfully acquired.

## SEVENTH CAUSE OF ACTION

### (Violation of North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA") N.C. Gen. Stat. Ann. §§ 75-1.1, et seq. ) (Sale of Unapproved Drug)

137. Plaintiff realleges and incorporates by reference each and every allegation set forth in paragraphs 1–77, above, as if fully stated herein.

138. The NCUDTPA prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. Ann. § 75-1.1(a).

139. Defendant has engaged in unfair or deceptive acts or practices unlawful under the NCUDTPA by selling and offering for sale in North Carolina its unapproved "semaglutide" in violation of the North Carolina Food, Drug, and Cosmetic Act. N.C.G.S.A. § 106-135(a).

140. Defendant's "semaglutide" is an unapproved new drug within the meaning of N.C. Gen. Stat. § 106-121(12) because it is not determined to be safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling.

141. Defendant's business acts and practices are also unfair because they have caused harm and injury-in-fact to Novo Nordisk for which Defendant has no justification other than to increase, beyond what Defendant would have otherwise realized, its revenue from the sale of unapproved "semaglutide" drugs.

142.   Given that Defendant's unapproved "semaglutide" drugs pose potential harm to consumers, Defendant's manufacture and sale of its drugs is a practice that is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers and to Plaintiff.

143.   Defendant uses an unfair and illegal business advantage by relying on Novo Nordisk's reputation with semaglutide while disregarding North Carolina law to sell its unapproved "semaglutide" drugs.

144.   N.C. Gen. Stat. § 75-16 creates a cause of action for "any person" injured by unfair methods of competition or unfair or deceptive acts or practices.

145.   Novo Nordisk is a "person" under N.C. Gen. Stat. § 75-16.

146.   Novo Nordisk is entitled to injunctive relief and damages under N.C. Gen. Stat. § 75-16, as well as reasonable attorneys' fees and costs pursuant to N.C. Gen. Stat. § 75-16.1.  Plaintiff is also entitled to disgorgement of Defendant's profits, revenues, and economic benefits wrongfully acquired.

## EIGHTH CAUSE OF ACTION

### (Violation of Texas Unfair Competition Law) (Sale of Unapproved Drug)

147.   Plaintiff realleges and incorporates by reference each and every allegation set forth in paragraphs 1–77, above, as if fully stated herein.

148.   A defendant violates Texas's law prohibiting unfair competition through (1) an illegal act by defendant that (2) interfered with the plaintiff's ability

to conduct its business. *W. Rsrv. Medtec Servs., LLC v. Stryker Corp.*, No. 4:18-CV-2604, 2019 WL 13191641, at *8 (S.D. Tex. May 13, 2019); *Taylor Pub. Co. v. Jostens, Inc.*, 216 F.3d 465, 486 (5th Cir. 2000).

149.    Defendant has engaged in an illegal act by advertising, promoting, selling and offering for sale unapproved new drugs in Texas in violation of the Texas Food, Drug, & Cosmetic Act, Tex. Health & Safety Code Ann. § 431.114(a).

150.    Defendant's "semaglutide" drugs are unapproved new drugs within the meaning of Tex. Health & Safety Code Ann. § 431.002 because they are not generally recognized among experts as safe and effective for use under the conditions prescribed, recommended, or suggested in their labeling.

151.    Defendant's illegal conduct has interfered with Novo Nordisk's ability to conduct its business through sales of "semaglutide" that otherwise would have been made by Novo Nordisk and through harm to Novo Nordisk's brand and customer goodwill.

152.    Additionally, through its illegal conduct, Defendant lures consumers away from obtaining safe and effective treatment, such as Novo Nordisk's FDA-approved semaglutide medicines, thereby interfering with Novo Nordisk's ability to conduct its business.

153.    Because Defendant's illegal conduct has interfered with Novo Nordisk's ability to conduct its business, Novo Nordisk has a cause of action under

the Texas common law of unfair competition to bring this claim.

154.   Defendant's unlawful and unfair conduct puts health, safety, and lives at risk, harming Novo Nordisk by creating a risk that customers will draw unwarranted conclusions about the safety and effectiveness of Novo Nordisk's FDA-approved semaglutide medicines.

155.   As a direct and proximate result of its unlawful and unfair business practices, Defendant has obtained an unfair and illegal business advantage, benefitting and profiting from sales made as a result of goodwill associated with Novo Nordisk's FDA-approved semaglutide medicines.  Novo Nordisk has suffered and will continue to suffer lost sales that can be measured and quantified as well as discernible competitive injury by the loss of goodwill.

156.   Defendant's unfair conduct is interfering with Novo Nordisk's ability to conduct its business.

157.   As a direct and proximate result of Defendant's unfair business practices, Novo Nordisk is suffering immediate and continuing, competitive, irreparable injury for which no adequate remedy at law exists.

158.   The practices described herein also offend established public policy regarding the protection of consumers against companies, like Defendant, that engage in unfair methods of competition.

159.   Novo Nordisk is entitled to declaratory and injunctive relief, as well as

reasonable attorney's fees and costs pursuant to Tex. Civ. Prac. & Rem. Code Ann. § 37.009.  Plaintiff is also entitled to disgorgement of Defendant's profits, revenues, and economic benefits wrongfully acquired.

## NINTH CAUSE OF ACTION

**(Violation of Colorado Consumer Protection Act ("CCPA"), Colo. Rev. Stat. § 6-1-105 *et seq.*, and Colorado Common Law of Unfair Competition) (Sale of Untailored Compounded Product That Is Essentially a Copy of the Commercially Available Product)**

160.  Plaintiff realleges and incorporates by reference each and every allegation set forth in paragraphs 1–77, above, as if fully stated herein.

161.  CCPA prohibits engaging in deceptive trade practices, including "any unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent act or practice," Colo. Rev. Stat. § 6-1-105(1)(rrr).

162.  Colorado has a provision that mirrors Section 503A of the Federal Food, Drug, and Cosmetic Act ("FDCA"), and Defendant has engaged in unfair trade practices in Colorado by knowingly or recklessly selling unapproved "semaglutide" drugs in Colorado that lack "a significant difference between the compounded drug and the comparable commercially available drug product as determined, by the prescriber, as necessary for the medical best interest of the patient," in violation of Colorado law.  3 Colo. Code Regs. § 719-1:21.00.30(f)(2); Colo. Rev. Stat. Ann. § 12-280-120(c); Colo. Rev. Stat. § 6-1-105(1)(rrr).

163.  Defendant violates Colorado law by selling drugs that are falsely

marketed as "personalized" but do not actually produce "a significant difference between the compounded drug and the comparable commercially available drug product as determined, by the prescriber, as necessary for the best medical interest of the patient" and thereby are engaging in an "unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent act or practice" as prohibited by Colorado law.

164. Defendant's unfair trade practices occurred during the course of Defendant's business.

165. Defendant's unfair trade practices significantly impact the public, who are the consumers of its unapproved "semaglutide" drugs. As discussed *supra*, unapproved compounded drugs pose serious risks to consumers.

166. Plaintiff has suffered injury to a legally protected interest in its lost sales, loss of goodwill, and damage to its reputation as a result of Defendant's unlawful conduct.

167. Plaintiff's injury is caused by Defendant's illegal sale of unapproved "semaglutide" drugs.

168. Plaintiff is entitled to declaratory relief, damages pursuant to Colo. Rev. Stat. § 6-1-113(2)(a), as well as its reasonable attorney's fees and costs pursuant to Colo. Rev. Stat. § 6-1-113(2)(b). Plaintiff is also entitled to disgorgement of Defendant's profits, revenues, and economic benefits wrongfully acquired.

## TENTH CAUSE OF ACTION

**(Violation of Minnesota Deceptive Trade Practices Act ("MDTPA") Minn. Stat. Ann. § 325D.43 *et seq.*) (Sale of Untailored Compounded Product That Is Essentially a Copy of the Commercially Available Product in Minnesota)**

169.   Plaintiff realleges and incorporates by reference each and every allegation set forth in paragraphs 1–77, above, as if fully stated herein.

170.   MDTPA prohibits "unfair methods of competition" or "unfair or unconscionable acts or practices."  Minn. Stat. § 325D.44, Subd. 1(13).

171.   Minnesota has a provision that mirrors Section 503A of the FDCA, and, Defendant has engaged in unfair trade practices in Minnesota by selling untailored "semaglutide" drugs in Minnesota that "are essentially copies of a commercially available drug product."  Minn. Stat. § 151.253, Subd. 2(4).  These drugs lack "a significant difference, as determined by the prescribing practitioner, between the compounded drug and the comparable commercially available drug product." Minn. Stat. § 151.253, Subd. 2(5).

172.   Defendant violates Minnesota law by selling its unapproved "semaglutide" drugs that are falsely marketed as "personalized" but that actually "a significant difference, as determined by the prescribing practitioner, between the compounded drug and the comparable commercially available drug product," and thereby are unfair and unconscionable practices in violation of Minnesota law.

173.   Defendant's sale of untailored "semaglutide" drugs in violation of

Minnesota law is an unfair and unconscionable act, practice, and method of competition. Defendant's practice of skirting Minnesota law provides Defendant an unfair advantage over law-abiding pharmaceutical manufacturers like Novo Nordisk, who spend significant time and resources to comply with state law.

174. Defendant's sales of untailored "semaglutide" drugs also confuse consumers into believing that they are receiving Novo Nordisk's commercially available and approved drug products. Worse, this practice harms patients by exposing them to unlawful and untailored products.

175. Defendant's unfair trade practices occurred during the course of Defendant's business.

176. Plaintiff has suffered injury to a legally protected interest in its lost sales, loss of goodwill, and damage to its reputation as a result of Defendant's unlawful conduct.

177. Plaintiff's injury is caused by Defendant's unlawful sale of untailored "semaglutide" drugs.

178. Defendant will continue to injure to Plaintiff so long as it continues to sell its untailored "semaglutide" drugs.

179. Plaintiff is entitled to injunctive relief pursuant to Minn. Stat. § 325D.45, Subd. 1, as well as its reasonable attorney's fees and costs pursuant to Minn. Stat. § 325D.45, Subd. 2.

## IV.    RESERVATION OF RIGHTS

180.   Upon information and belief, Defendant has shipped unapproved and untailored semaglutide products to states other than those expressly identified in this Complaint.   To date, Defendant has refused to provide that information.   Novo Nordisk reserves the right to amend its Complaint to add additional causes of action based on Defendant's conduct directed to or otherwise involving sales or distribution of unapproved and untailored semaglutide in other states.

## CONCLUSION AND PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor:

1. A permanent injunction enjoining Defendant from continuing the unlawful and unfair business practices alleged in this complaint, which injunction has a value in excess of $75,000 for purposes of jurisdiction;

2. That Plaintiff be awarded monetary damages in the form of its actual damages in an amount to be determined;

3. A judgment that Defendant has violated the CCPA, CUTPA, FDUTPA, GUDPTA, HUDAP, ICFA, MDTPA, Texas unfair competition law, and NCUDTPA;

4. An order requiring Defendant to disgorge all profits, revenues, and economic benefits wrongfully acquired;

5. Declaratory relief;

6. Pre-judgment and post-judgment interest;

7. Attorney's fees and costs incurred in this action, to the extent available;

and

8. Any further relief the Court may deem just and proper.

DEMAND FOR JURY TRIAL.


Dated: July 31, 2026                          Respectfully submitted,


                                   By:   */s/ Jonathan L. Smith*
                                         Trevor Carolan
                                         Texas Bar No. 24128898
                                         BOWMAN AND BROOKE LLP
                                         5850 Granite Parkway, Suite 900
                                         Plano, Texas 75024
                                         Telephone: (972) 616-1700
                                         Fax: (972) 616-1701
                                         trevor.carolan@bowmanandbrooke.com

                                         Randall L. Christian
                                         Texas Bar No. 00783826
                                         Jonathan L. Smith
                                         Texas Bar No. 24088436
                                         BOWMAN AND BROOKE LLP
                                         2901 Via Fortuna Drive, Suite 500
                                         Austin, TX 78746
                                         Tel.: (512) 874-3800
                                         Fax: (512) 874-3801
                                         Randall.Christian@bowmanandbrooke.com
                                         Jonathan.Smith@bowmanandbrooke.com

                                         and

Michael X. Imbroscio
(admitted *pro hac vice*)
Kevin M. Kelly
(admitted *pro hac vice*)
Garrett Cunningham
(admitted *pro hac vice*)
Lauren T. Smith
(admitted *pro hac vice*)
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
mimbroscio@cov.com
kkelly@cov.com
gcunningham@cov.com
lsmith@cov.com

Kurt Calia
(admitted *pro hac vice*)
COVINGTON & BURLING LLP
3000 El Camino Real, 5 Palo Alto
Square, 10th Floor
Palo Alto, CA 94306-2112
(650) 632-4700
kcalia@cov.com

***Attorneys for Plaintiff***
***NOVO NORDISK INC.***

# <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on July 31, 2026, I caused the foregoing document to be filed with the Clerk of the Court of the United States District Court for the Northern District of Texas using the Court's CM/ECF system.

<u>/s/Jonathan L. Smith</u>